236 N.J. Super. 451 (1989)
566 A.2d 215
SHELDON H. PARKER, PLAINTIFF-RESPONDENT,
v.
M & T CHEMICALS, INC., A CORPORATION OF THE STATE OF DELAWARE; GORDON C. ANDREWS, INDIVIDUALLY, AND AS VICE-PRESIDENT, GENERAL COUNSEL AND SECRETARY OF M & T CHEMICALS, INC.; WILLIAM M. KRAUS, INDIVIDUALLY, AND AS VICE-PRESIDENT OF M & T CHEMICALS, INC., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 1989.
Decided October 30, 1989.
*452 Before Judges KING, BRODY and SKILLMAN.
Jon W. Green argued the cause for appellants (Epstein, Becker & Green, attorneys; M. Elaine Jacoby, of counsel; Beverly A. Williams, on the brief).
Martin W. Aron argued the cause for respondent Sheldon H. Parker (Budd Larner Gross Picillo Rosenbaum Greenberg & Sade, attorneys).
The opinion of the court was delivered by KING, P.J.A.D.
We granted leave to appeal in this matter, R. 2:2-4, to examine the question whether an in-house attorney may maintain an action under the Conscientious Employee Protection Act (Act), N.J.S.A. 34:19-1 to 34:19-8, commonly called the "Whistle Blower's Act," consistent with the Code of Professional Ethics adopted by the Supreme Court in the exercise of its exclusive authority to regulate the practice of law. The question whether an attorney's employer can be required to reinstate a discharged attorney is not before us. Plaintiff here seeks money damages and attorneys' fees only, not reinstatement. The Law Division judge ruled that plaintiff's complaint stated a claim for relief under the Act. We agree and affirm.
We relate here in detail the allegations of the complaint, filed on August 8, 1988, which the Law Division judge ruled was sufficient to overcome a motion to dismiss for failure to state a claim upon which relief can be granted. R. 4:6-2(e). A motion *453 under this rule, unlike a motion for summary judgment, R. 4:46, is based on the pleadings. "A complaint should not be dismissed under this rule where a cause of action is suggested by the facts and a theory of actionability may be articulated by way of amendment." Rieder v. State Dept. of Transp., 221 N.J. Super. 547, 552 (App.Div. 1987). As our Supreme Court has recently emphasized, motions to dismiss pursuant to R. 4:6-2(e), "almost always brought at the very earliest stages of the litigation," should be granted "in only the rarest of instances." Printing Mart  Morristown v. Sharp Electronics Corp., 116 N.J. 739, 772 (1989). We must assume the facts as asserted by the plaintiff are true and give him the benefit of all inferences that may be drawn in his favor. Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 192 (1988).
These are plaintiff's assertions. Defendant M & T Chemicals, Inc. (M & T) is located in Woodbridge and develops and markets specialty chemicals for electronics and other industries. Plaintiff was formerly employed for seven years at M & T as Director of Patents. Defendant Gordon C. Andrews was the Vice-President, Secretary and General Counsel of M & T. Defendant William M. Kraus was a Vice-President of M & T. Plaintiff alleges that Andrews and Kraus were his employers within the meaning of the Act.
During his seven years of employment by M & T, plaintiff alleges that he "received favorable evaluations and raises which recognized his meritorious service." Plaintiff claims to have performed administrative and business, as well as legal functions. By interoffice memorandum, dated December 3, 1987, plaintiff was demoted abruptly to Assistant General Patent Counsel.
For several years before this date M & T had eagerly sought to obtain or develop specialized technology so it could manufacture methyltin stabilizers. This desire was reflected in an internal memorandum of June 27, 1986 stating that M & T was "actually working to obtain or develop" methyltin technology *454 and that the company's objective was to be in the methyltin stabilizer business "no later than mid-1989 and possibly in early 1988." Despite these efforts, M & T had little success getting the desired technology.
On August 7, 1987 an M & T employee, Robert Ringwood, telephoned plaintiff to tell him that certain confidential documents containing competitor's trade secrets were about to be transmitted to plaintiff for copying. Because plaintiff was not aware of any decision to obtain or use any competitor's trade secrets, he questioned the propriety of the proposed conduct.
On further inquiry, plaintiff discovered that a former employee of M & T, William Mayo, had obtained confidential documents from his current employer, Cardinal Corporation. Cardinal had obtained a copy of the documents from the United States District Court for the Eastern District of Louisiana. The documents were copies of transcripts in pending litigation in that District and were the subject of a protective order signed by Judge McNamara on February 7, 1986. Upon information and belief of the plaintiff, "the Court's release of the sealed transcripts was inadvertent, and when the error became known, the Court requested return of the documents." M & T was not a party to this litigation and had no right to the sealed transcripts.
The transcripts inadvertently released by the court contained trade secrets of both Argus Chemical Company, a subsidiary of Witco Chemical Company, and of the Carstab Division of Morton Thiokol, Inc. Plaintiff claims that the defendants in the present action believed that these trade secrets would be valuable to M & T because they contained confidential information regarding methyltin stabilizer technology and also because defendants believed that the confidential transcripts would provide them with an advantage in M & T's own litigation with Morton Thiokol, Inc. then pending in the Federal Court in Delaware. Plaintiff claims that William Mayo, the former M & T employee, had offered to make the transcripts available to *455 defendants in return for a sum of money. Plaintiff asserts that William Kraus, M & T's Vice-President, authorized payment to Mayo.
Plaintiff claims that in his absence, M & T's general counsel, defendant Gordon C. Andrews, had conducted a meeting in which he designated plaintiff to supervise the copying and use of these confidential transcripts. Plaintiff says that "this was an attempt by Andrews to insulate himself from any unlawful or unethical conduct." Plaintiff continues that Andrews knew that the sealed transcripts contained trade secrets of Argus and Carstab and that these companies had not permitted their release. Defendant Kraus allegedly told plaintiff that Andrews was "comfortable" with the theft or misappropriation of the trade secrets and that defendants had left no "paper trail" which could be detected. Plaintiff believes that defendants paid Mayo for access to the sealed documents.
On August 17, 1987 plaintiff sent a memorandum to Andrews in which he objected to M & T's action. The defendant filed this memorandum with the court in support of his motion to dismiss. Plaintiff concluded his remarks in this detailed memorandum as follows:
It is my understanding that to date the documents have not been reviewed by anyone at M & T Chemicals, but have remained under lock and key since their receipt. In view of the present situation I strongly recommend that the documents not be examined until such time as we have a definitive written opinion or court approval[. A]t this time it seems appropriate that I turn these documents to you for your safe keeping until this matter is resolved.
I believe it important to resolve this matter promptly and would hope that we can determine our legal rights or obligations regarding such documents by the end of the week. If you need any assistance in this matter please let me know.
Plaintiff alleges that he continued to object to M & T's management of this matter because he reasonably believed that the company was engaged in unlawful and fraudulent conduct in violation of the canons of ethics binding attorneys.
Plaintiff concludes his complaint with a recitation of the retaliations against him. He says that he was "verbally reprimanded for his orchestration of these events" by M & T's *456 president and chief executive officer, Max Bass, and two other officers, Anthony DeLuca and William Brewster. He asserts that he was demoted from Director of Patents to Assistant General Patent Counsel. In contrast, defendant Gordon Andrews was appointed Secretary of M & T and made a member of the company's policy committee.
In the concluding paragraphs of his complaint, plaintiff alleges the course of retaliation and "constructive discharge" in this way:
13. After the unlawful demotion, defendants created an intolerable work environment for plaintiff that exacerbated an existing medical condition and caused plaintiff great anxiety, embarrassment and humiliation. Defendants, inter alia, criticized plaintiff's use of sick days for legitimate medical problems and took other action that was demeaning in nature. Stanley Marcus, plaintiff's new supervisor, made clear that if plaintiff "rocked the boat" he would be terminated. By this conduct defendants constructively discharged plaintiff from his employment.
14. In objecting to defendants' proposed theft and/or misappropriation of trade secrets contained in documents under seal of Court, plaintiff was engaged in conduct protected by the Conscientious Employee Protection Act (the "CEPA"), N.J.S.A. 34:19-1 et seq. Despite that fact, defendants retaliated against plaintiff by demoting him to Assistant General Patent Counsel and then constructively discharging him from his employment, in violation of the CEPA.
We were advised in the briefs and at oral argument that plaintiff resigned his employment on April 29, 1988. Plaintiff demands a jury trial, compensatory and punitive damages, attorney's fees and costs. He does not demand reinstatement, a remedy provided by the Act. Defendants vigorously deny all of plaintiff's allegations and any wrongdoing.
In this State the Legislature has enacted the Conscientious Employee Protection Act (Act), L. 1986, c. 105, effective September 5, 1986; N.J.S.A. 34:19-1 to 34:19-8, commonly known as a "whistle-blower act." We have recently said "we view this legislation as a reaffirmation of this State's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge." Lepore v. National Tool and Mfg. Co., 224 N.J. Super. 463, 470 (App.Div. *457 1988), aff'd [and quoted at] 115 N.J. 226, 228 (1989). The Act is largely consistent with and declarative of our State's recent case law. "In New Jersey, we are deeply committed to the principle that an employer's right to discharge an employee carries a correlative duty to protect his freedom to decline to perform an act that would constitute a violation of a clear mandate of public policy." D'Agostino v. Johnson & Johnson, Inc., 225 N.J. Super. 250, 265 (App.Div. 1988), aff'd o.b. 115 N.J. 491 (1989); see also Potter v. Village Bank of N.J., 225 N.J. Super. 547 (App.Div. 1988).
The Act defines an "employer" as any corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent. N.J.S.A. 34:19-2(a). An "employee" means any individual who performs services for and under the control and direction of an employer for wages or other remuneration. N.J.S.A. 34:19-2(b). A "supervisor" is generally any individual with control over the affected employee who has authority to take corrective action regarding the illegality of which the employee complains. N.J.S.A. 34:19-2(d). "Retaliatory action" means the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment. N.J.S.A. 34:19-2(e).
Pertinent to plaintiff's claim here, subsections 3(a) and (c) of the Act prohibit retaliatory action against an employee who
a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;
....
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare. [N.J.S.A. 34:19-3(a), (c).]
*458 Upon a violation of the Act, an aggrieved employee or former employee may bring a civil action within one year for: injunctive relief, reinstatement, compensation for lost wages, benefits and other remuneration, costs and attorney's fees, punitive damages, and assessment of civil fines payable to the State Treasurer for deposit in the general fund. N.J.S.A. 34:19-5. If an action is groundless, an employee may be liable for attorney's fees and costs. N.J.S.A. 34:19-6. As noted, plaintiff here demands only damages and fees, not injunctive relief or reinstatement.
Defendants, in effect, seek an implied exemption from the Act because plaintiff was employed as an in-house attorney. They assert that the Act unconstitutionally impinges on the Supreme Court's plenary and exclusive power to regulate the conduct of attorneys.[1]American Trial Lawyers v. N.J. Supreme Court, 66 N.J. 258, 262-265 (1974). Specifically, defendants claim that the professional relationship would be severely compromised by permitting the Act to dictate the manner or circumstances in which the relationship may be dissolved or altered. Defendants assert that a client has the right to discharge an attorney employed by a corporation as house counsel, with or without cause, and without fear of sanction for the employer's wrongdoing, at any time the client corporation choses to end the relationship, notwithstanding the provisions of the Act, relying on R.P.C. 1.16(a)(3) (lawyer shall withdraw from representation if discharged), and that this "right may not be diminished by legislative enactment."
Defendants rely principally on Matter of the Hearing on Immunity for Ethics Complainants, 96 N.J. 669 (1984), and Taylor v. Hoboken Bd. of Educ., 187 N.J. Super. 546 (App.Div.), *459 certif. den. 95 N.J. 228 (1983), two cases in which our Courts have held that legislative enactments unconstitutionally impinged on the Supreme Court's authority to regulate the practice of law. In the former case, the Supreme Court by a 4-3 vote, held that a statute permitting a lawyer to file suit against an ethics complainant for malicious civil prosecution, N.J.S.A. 2A:47A-1 (L. 1956, c. 122), unconstitutionally conflicted with R. 1:20-11(b) which grants absolute immunity to ethics complainants. The Court candidly acknowledged "... being seriously divided on the wisdom of [Rule 1:20-11(b)]." 96 N.J. at 671.
In Taylor v. Hoboken we held that an attorney's duty to withdraw as a school board attorney when he was discharged by the Board took precedence over any veteran's tenure right to the position that he could assert under N.J.S.A. 38:16-1 et seq., the Veteran's Tenure Act. In Taylor, Judge McElroy stated:
We are mindful of the principle that a declaration holding an act of the Legislature even partially unconstitutional (here only as it applies to members of the bar) is a sensitive ruling not to be undertaken unless there be no possible accommodation between the force of the statute and the conflicting rule. Cf. Ahto v. Weaver, 39 N.J. 418, 428 (1963). Nevertheless, there does come a time when that disagreeable judicial venture arises. [187 N.J. Super. at 554].
In the case before us, we find that the "force of the statute" can be accommodated to the allegedly conflicting ethical principle.
Defendants also rely on two cases from other jurisdictions which refused to recognize an attorney's cause of action for wrongful or retaliatory discharge at common law, where the state legislatures had not adopted "whistle-blower" statutes. The claims presented in these cases did not, of course, call upon the courts to consider the constitutionality of a state statute. Herbster v. North American Co., 150 Ill. App.3d 21, 103 Ill. Dec. 322, 501 N.E.2d 343 (1986), appeal dismissed 114 Ill.2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728 (1987) (vice-president in charge of legal department had no claim); Willy v. Coastal Corporation, 647 F. Supp. 116 (S.D.Texas 1986), rev'd in part on other grounds, 855 F.2d 1160 (5th Cir.1988) ("in-house" *460 counsel fired for requiring compliance with environmental laws had no action under Texas common law).
We conclude that our State's Conscientious Employee Protection Act does not, in this claim for money damages only, require an implied exception for in-house attorneys to survive a constitutional challenge. In the context of the case before us, our interpretation of the Act neither compels an employer-client to accept an unwanted employee-attorney by preventing his discharge at will nor threatens to discourage an ethics or fee dispute complaint. Our affirmance here and our construction of the Act compels a retaliating employer to pay damages to an employee-attorney who is wrongfully discharged or mistreated for refusing to join a scheme to cheat a competitor or, indeed, for any reason which is violative of law, fraudulent, criminal, or incompatible with a clear mandate of New Jersey's public policy concerning public health, safety or welfare. The employer is always free to show that the discharge was animated by incompetence, disloyalty, reduction in force, or any other legitimate reason.
Our holding does not discourage ethics complaints against shiftless attorneys or foist unwanted counselors on public or even private clients, as contrary holdings in Immunity for Ethics Complainants and Taylor v. Hoboken would have done. Nor does our holding permit the Legislature in any way to meddle in the procedural mechanics of the Supreme Court's control over the practice of law. The employer-client is still free to file an ethics complaint against the former employee-attorney if professional confidences or proprieties are violated. The attorney is still subject to the same discipline as before the adoption of the Act. If anything, our holding should discourage employers from inducing employee-attorneys to participate in or condone illegal schemes and should encourage an attorney's resolve to resist such inducements because they may now enjoy some specific statutory protections.
*461 In Knight v. Margate, 86 N.J. 374 (1981), our Supreme Court upheld the constitutionality of provisions of the Conflict of Interest Law N.J.S.A. 52:13D-16, 52:13D-17.2, prohibiting members of the judiciary, particularly part-time municipal court judges in Atlantic City, from dealing with casinos. The appellants, The Atlantic County Municipal Judges' Association, claimed that Art. VI, § 2, par. 3 of the New Jersey Constitution precluded the Legislature from enacting any laws that attempted "to govern the ethical conduct of the judiciary or persons admitted to the practice of law." 86 N.J. at 386. The Supreme Court rejected the view that it alone, for all circumstances and for all purposes, was the only branch of government which had authority over judges, attorneys, and the practice of law. The question to be answered in a particular case, said the Court, is "whether such legislative action can be reconciled with the Supreme Court's preeminent, exclusive and extensive constitutional powers over the judicial branch of government." Id. at 387. The doctrine of separation of powers is not violated if one branch of government which acts with respect to the province of another does not "seek dominance or hegemony over the other branches, ..." id. at 388, but only attempts to share and exercise jointly responsibility and power such that "the ultimate governmental objective is to be achieved." Id. at 389. Justice Handler, for the Court, stressed the "twin principles of the separation and interdependence of governmental powers," id. at 391 as prevailing over the notion of the preclusive, paramouncy of the doctrine of separation of powers, where there is no interference with judicial prerogatives or impingement upon the Court's constitutional powers by the Legislature.
In the situation before us, we see no "conflict with the constitutional judicial powers of the Supreme Court." Id. at 394. The Whistle Blowers Act "serves an important, legitimate governmental purpose clearly within the State['s] police powers and deals with a direct and vital concern of the legislature...." Ibid. The Act does not interfere with the Court's regulation of the legal profession. The Act does not interfere with any *462 legitimate interest of the employer-client. Rather, it reinforces the Court's constitutional mission to encourage and insure the ethical practice of law. We see no constitutional incompatibility and will not read in-house attorneys out of the Act's protection.
Finally, we reject defendants' contention that the attorney-client privilege respecting disclosure of confidential communications inherently conflicts with the assertion of a claim under the Act and that entertaining such a cause of action is somehow inimicable to the healthy subsistence of attorney-client relationships in general. The commission of a crime or fraud is excepted from the attorney-client privilege under N.J.S.A. 2A:84A-20(2)(a). The "privilege shall not extend ... to a communication in the course of legal service sought or obtained in aid of the commission of a crime or a fraud...." Ibid.; Evid.R. 26(2)(a).
In Fellerman v. Bradley, 99 N.J. 493, 503 (1985), our Supreme Court gave generous content to this exception to the attorney client privilege, saying:
The "crime or fraud" exception to the privilege represents a statutory recognition of a situation in which the purpose of the privilege would not be served by its enforcement. The exception encompasses a type of communication that is alien to the fundamental reasons that underlie the privilege.... Thus, when a client seeks the aid of an attorney for the purpose of committing a fraud, a communication in furtherance of that design is not privileged.
In this context our courts have generally given the term "fraud" an expansive reading.... The policy behind the protection of the relationship between client and attorney serves to limit the attorney-client privilege to situations in which lawful legal advice is the object of the relationship. [99 N.J. at 503-505.]
As stated by Justice Cardozo, "[t]here is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve in the commission of a fraud will have no help from the law. He must let the truth be told." Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (cited by Fellerman, 99 N.J. at 507). Moreover, "[l]awyers are not tools of injustice." In re Nackson, 114 N.J. 527, 534 (1989).
*463 We reject defendants' contention that an attorney can have no claim under the Whistle Blower's Act because "plaintiff's terms of employment or retention by his client-employer is subject not to the will of the Legislature, but to the ethical strictures promulgated by the Supreme Court." (Statement taken from defendant's brief at 8.) The purpose behind the Supreme Court's authority over the practice of law in this State cannot be ignored. The State Constitution does not grant the responsibility of control for the sake of control alone. In American Trial Lawyers, 66 N.J. at 264 Chief Justice Hughes expressed that the people, in their constitutional grant of power, "intended [the] responsibility [over the practice of law] to extend to every area in which unjust or unethical conduct might afflict the public at the hands of those admitted by the Court to the practice of the law." The Chief Justice concluded that "the people ... trusted and commissioned the Supreme Court, in effect, to `keep the house of the law in order.'" Ibid. Our holding today does not interfere with the Supreme Court's mandate over the practice of law. If anything, our holding should reinforce integrity and ethical professional practice, not interfere with it.
We find no constitutional or practical necessity to declare the Conscientious Employee Protection Act unconstitutional insofar as an in-house attorney's claims for money damages and fees arising from wrongful retaliation during the in-house employment relationship are concerned.[2] The order refusing to dismiss the complaint is affirmed.
NOTES
[1] N.J. Constitution, Art. VI, § II, para. 3 states:

The Supreme Court shall make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.
[2] We are not called upon in this case to decide the scope or extent of the attorney-client privilege against disclosure of confidential communications in litigation of this sort. Doubtless, these questions will arise in this and other cases brought under the Act. They must be resolved by trial-level judges as they arise.

We do note that in certain circumstances an attorney has a right to reveal otherwise privileged information. The extent to which these exceptions pertain to the "whistle blower" context remains to be developed. Under R.P.C. 1.6(c)(2), a lawyer may reveal information to the extent the lawyer reasonably believes necessary:
(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal charge, civil claim or disciplinary complaint against the lawyer based upon the conduct in which the client was involved.
A lawyer is permitted to disclose otherwise confidential information which he reasonably believes necessary to support a claim against a client. ABA/BNA Lawyers' Manual on Professional Conduct, 55:701. See First Federal Savings & Loan v. Oppenheim, 110 F.R.D. 557, 561 (S.D.N.Y. 1986); see also 2 Weinstein's Evidence, ¶ 503(d)(3)[01] at 503-72.
Very recent authority for exceptions to the privilege where a bona fide compensation-based dispute exists between attorney and client is found in Restatement 3d, The Law Governing Lawyers, § 117 at 53 (Tentative draft # 2, April 7, 1989).
A lawyer may use or disclose confidential client information to the extent that the lawyer reasonably believes necessary in order to permit the lawyer to resolve a dispute with the client concerning compensation or reimbursement that the lawyer reasonably claims is due to the lawyer.
There should be a "proportionate and restrained use or disclosure." Id. at Comment d. See Doe v. A Corp., 709 F.2d 1043, 1044 n. 1 (5th Cir.1983), where in a suit by a former house counsel against former employer-client based on pension and life insurance plan claims, on defendant corporations' motion, the court ordered the record sealed; the suit was to be prosecuted without disclosing the name of either party and confidentiality otherwise maintained. The Restatement's Tentative Draft also recommends exceptions to the privilege for "Client Crimes and Fraud," § 132 at 238 and for "Lawyer Self-Protection," § 133 at 252. The latter section concludes that the privilege does not apply to a communication relevant and appropriate for a lawyer to employer "(1) to resolve a dispute with a client concerning compensation or reimbursement that the lawyer reasonably claims is due to the lawyer from the client."